IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROGER MILLER, ID # 27763-177, | ) | |
| Petitioner, | ) | |
| vs. | ) | No. 3:07-CV-0712-B (BH) |
| | ) | ECF |
| DAVID BERKEBILE, | ) | Referred to U.S. Magistrate Judge |
| Respondent. | ) | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b), and an Order of the Court in implementation thereof, subject cause has previously been referred to the United States Magistrate Judge. The findings, conclusions, and recommendation of the Magistrate Judge are as follows:

## I. BACKGROUND

### A. Nature of Action

Petitioner, a prisoner currently incarcerated in the Federal Correctional Institution (FCI) located in Seagoville, Texas, brings this habeas action pursuant to 28 U.S.C. § 2241.[1] David Berkebile, Warden of FCI Seagoville, is the proper respondent.

### B. Claims

Petitioner claims that the Bureau of Prisons (BOP) has categorically denied him placement in home confinement or a halfway house or Community Correction Center (CCC),[2] and he specif-

---

[1] Respondent argues that § 2241 provides no jurisdictional basis for this action because petitioner is challenging where he should serve his sentence, not the fact or duration of his custody. This Court has specifically rejected respondent's position in this same context. *See, e.g., Bell v. Berkebile,* No. 3:07-CV-1067-B, 2007 WL 3333196, *1-2 (N.D. Tex. Nov. 9, 2007) (findings, conclusions, and recommendation accepted by District Court); *Mihailovich v. Berkebile,* No. 3:06-CV-1603-N, 2007 WL 942091, at *3-4 (N.D. Tex. March 28, 2007) (same). Respondent provides no convincing reason to diverge from this Court's previous finding. Consequently, petitioner has properly invoked § 2241 as a basis for this action.

[2] As of March 31, 2006, the BOP refers to halfway houses which were formerly titled "Community Corrections Centers" as "Residential Reentry Centers" (RRCs). Because much of the authority cited herein refers to halfway houses or CCCs, these terms will be used interchangeably with RRCs.

ically challenges the BOP policies concerning such placement. (*See generally* Pet.; 28 C.F.R. §§ 570.20, 570.21 and BOP Program Statements 7320.01 and 7310.04.) He argues that respondent is collaterally estopped from re-litigating issues that were decided against respondent in *Mihailovich v. Berkebile*, No. 3:06-CV-1603-N, 2007 WL 942091 (N.D. Tex. March 28, 2007) (findings, conclusions, and recommendation accepted by District Court). (Pet. at 7-8.) He further claims that respondent has violated his right to equal protection by treating him differently than the petitioner in *Mihailovich* and by categorically denying him consideration for home confinement when individuals whom are already housed in a CCC are given such consideration. (*See id.* at 11-13 & n.1.)

In his Answer, respondent argues that petitioner has not exhausted his administrative remedies, that he is not collaterally estopped from contesting petitioner's claims, and that the petition fails on its merits. (*See generally* Answer.)

## C. Exhaustion

Petitioner affirmatively asserts that he has exhausted all <u>available</u> administrative remedies. (Pet. at 14.) He contends that he attempted to commence the formal component of the administrative process by submitting a properly signed and completed Request for Administrative Remedy, also known as a BP-9,[3] to his Correctional Counselor, James McShan (McShan), (*id.* at 14-18), but McShan refused to accept his BP-9 on April 18, 2007, (*see* Aff. attached to Pet.). He argues that such refusal rendered further administrative remedies unavailable. (Pet. at 16.) He also claims that respondent is equitably estopped from asserting his failure to exhaust as a defense because of McShan's affirmative misconduct. (*Id.* at 18-19.)

---

[3] According to local procedures applicable at FCI Seagoville, the BP-9 form is more accurately referred to as a BP-229(13) form. *See* Institution Supplement SEA 1330.13(g), *Administrative Remedy Program* (May 31, 2006).

Respondent contends that petitioner has not completed the administrative process. (Answer at 15-16.) He argues that prison records show no attempt by petitioner to file a BP-9, and that petitioner's affidavit is not credible because it is identical (except for names and dates) to affidavits filed in numerous related cases and is contrary to McShan's averment that he did not refuse to accept a BP-9 from petitioner. (*Id.* at 16; Aff. McShan, attached as Ex. A to Answer.)

In reply, petitioner argues that respondent has not responded to his equitable estoppel argument and has thus waived his right to object to application of estoppel; further, respondent has not carried his burden to show a failure to exhaust because he relies on a legally invalid declaration from McShan. (*See* Reply at 7-9.) Petitioner provides additional information in support of his allegations of exhaustion, including when he obtained the BP-9 from McShan, the circumstances of the alleged refusal to accept it, the BP-9 form that he allegedly attempted to give to McShan, and numerous affidavits from other inmates to show similar refusals by McShan to accept their BP-9s. (*See id.*; Petr.'s Expanded Decl., attached as App. 1 to Reply; Request for Admin. Remedy, attached to Petr.'s Expanded Decl.; App. 2 submitted with Reply.) Finally, he moves to strike McShan's declaration as legally insufficient "due to its hedging and qualification assertion that the facts are only true and correct to the best of my knowledge and belief." (Reply at 7 (internal quotation marks omitted).)[4]

On October 23, 2007, the Court conducted a consolidated evidentiary hearing on the issue of whether McShan refused to accept forms from inmates. Eight inmates and three prison employees testified at the hearing, testimony from other inmates was proffered, and various exhibits were ad-

---

[4] Petitioner has also moved to strike respondent's exhibits provided in support of the answer and has submitted an alternate motion for a show cause order and referral for investigation into whether McShan provided false statements in his declaration. These motions have been denied in a contemporaneous order.

mitted into the record.[5]  After hearing the testimony and proffers and reviewing all materials submitted as well as the governing federal regulations, the Court makes the following findings of fact.

## II.  FINDINGS OF FACT[6]

### A.  <u>Seagoville Staff</u>

At all relevant times, David Berkebile served as Warden at FCI Seagoville; Tanya Blakely served as Coordinator; Jeannine Milton served as Case Manager; and James McShan served as Correctional Counselor for petitioner.

### B.  <u>Written Procedures</u>

Federal regulations 28 C.F.R. §§ 542.10-542.19 set out a multi-tiered BOP administrative procedure for inmates who seek formal review of their complaints.  *Mihailovich v. Berkebile*, No. 3:06-CV-1603-N, 2007 WL 942091, at *6-7 (N.D. Tex. March 28, 2007) (findings, conclusions, and recommendation accepted by District Court).  BOP Program Statement (PS) 1330.13, *Administrative Remedy Program*, outlines the procedure and provides guidance to federal prisons.  *Aguirre-Castillo v. United States*, No. 1:03-CV-146-C, 2004 WL 594105 at *2 (N.D. Tex. Feb. 26, 2004).  In addition, FCI Seagoville has established local procedures to supplement PS 1330.13.  *See* Institution Supplement SEA 1330.13(g), *Administrative Remedy Program* (May 31, 2006).  Pursuant to the established BOP procedure, inmates may seek formal review of issues relating to any aspect of confinement.  28 C.F.R. § 542.10.  "Inmates have the responsibility to use [the administrative process]

---

[5]  Petitioner's hearing exhibits are marked as "defendant's" exhibits, but the Court will refer to them as petitioner's exhibits to avoid unnecessary confusion.

[6]  Unless otherwise stated, each finding of fact relates to FCI Seagoville for the time period relevant to the issues raised in this action.  Furthermore, each fact is supported by the relevant, credible testimony given at the evidentiary hearing or other cited authority.

in good faith and in an honest and straightforward manner." *Id.* § 542.11(b).

In most circumstances,[7] an inmate commences the administrative process informally by presenting an issue of concern to staff; staff then attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy, also known as a BP-9. *Id.* § 542.13(a). The appropriate staff member at FCI Seagoville is the inmate's assigned counselor. *See* SEA 1330.13(g) ¶ (5)(a). In addition to attempting to informally resolve the complaint, counselors must document the complaint on an Informal Resolution form known as a BP-8, and retain the BP-8 for later attachment to a completed BP-9 if the inmate initiates the formal process. *Id.* ¶¶ (5)(a) and (b), 6(a).

Whether or not an inmate pursues or completes the informal resolution component of the administrative procedures, he may request and obtain a BP-9 from his assigned counselor. *See* 28 C.F.R. § 542.13(b) (providing for discretionary waiver of informal resolution attempts upon showing of "an acceptable reason for bypassing informal resolution"); § 542.14(c)(1) (providing that non-CCC inmates shall obtain the appropriate form from institution staff – ordinarily, the correctional counselor); SEA 1330.13(g) ¶ (5)(a) (providing that BP-9s are only available from counselors); PS 1330.13 ¶ 8(b) (permitting staff to provide BP-9 form even when an inmate refuses to present a complaint informally)[8].

To commence the formal portion of the administrative process in the absence of a complaint

---

[7] Section 542.13(b) sets forth exceptions to the informal review requirement. Because such requirement is not at issue in this case, the exceptions are immaterial to this case.

[8] Paragraph 8 of PS 1330.13 provides in pertinent part:
> If an inmate requests an Administrative Remedy form but has not attempted informal resolution, staff should counsel the inmate that informal resolution is ordinarily required. If the inmate nevertheless refuses to present a request informally, staff should provide the form for a formal Request. Upon receipt of the inmate's submission, the Coordinator shall accept the Request if, in the Coordinator's discretion, informal resolution was bypassed for valid reasons, or may reject it if there are no valid reasons for bypassing informal resolution.

that falls within one of four enumerated exceptions in § 542.14(d),[9] the inmate must return a completed, dated, and signed BP-9 "to the issuing Counselor for attachment of the Informal Resolution form". SEA 1330.13(g) ¶ (5)(b); *accord* 28 C.F.R. § 542.14(c)(4). Unless extended upon demonstration of a valid reason for delay,[10] a BP-9 must be submitted within twenty days of the event that prompted the BP-9. 28 C.F.R. § 542.14.

After receiving a completed BP-9, the counselor will attach the BP-8 and deliver the BP-9 to the Administrative Remedy Clerk (Clerk) by the next business day. SEA 1330.13(g) ¶ (6)(a). Prison counselors have no authority to refuse to accept a BP-9. The Clerk logs the BP-9 into the computer system (SENTRY), prints a receipt of the transaction, and provides the receipt to the inmate. *Id.* ¶ (6)(c). The Clerk enters all submissions into SENTRY, even those that are rejected for some reason. PS 1330.13 ¶ 13(a).

The Administrative Remedy Coordinator (Coordinator) (1) determines whether the BP-9 meets the criteria in Program Statement 1330.13; (2) assigns a person to investigate the complaint and prepare a proposed response; (3) sends the complaint to the assigned investigator who will provide a proposed response within seven days of the date received; (4) reviews the investigator's response to determine whether the investigator appropriately addressed all issues; and (5) presents

---

[9] Section 542.14(d) provides four instances – (1) "Sensitive issues", (2) "DHO appeals", (3) "Control Unit Appeals", and (4) "Controlled housing status appeals" – when an inmate may go directly to the Regional or Central Office. With respect to subparagraph (1), an inmate may file a sensitive complaint directly with the Regional Director, when "the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution." According to the prison's Admission and Orientation Handbook dated April 27, 2006, (hereinafter referred to as AOH), submitted as Petr.'s Ex. 12 at the hearing, inmates may file a sensitive complaint directly to the Regional Director, when they believe their complaint to be "of such a sensitive nature that [the inmate] would be adversely affected if the complaint became known to the institution."

[10] A valid reason for delay includes "an unusually long period taken for informal resolution attempts." 28 C.F.R. § 542.14(b).

the BP-9, investigation results, and proposed response to the Warden. SEA 1330.13(g) ¶¶ (6)(b), (d), and (e). With respect to submitted BP-9s, PS 1330.13 requires:

1. a prior, informal resolution attempt as set forth in 28 C.F.R. § 542.13;

2. utilization of the appropriate BP-9 form;

3. complaints that are limited to a single issue or a reasonable number of closely related issues; and

4. submission of a dated and signed BP-9 to the designated staff member.

PS 1330.13 ¶¶ 7-8. The Coordinator may reject a BP-9 if the inmate bypasses the informal resolution process without a valid reason. *Id.* ¶ 8. In addition, PS 1330.13 recognizes that, with written notice signed by the Coordinator, a "Coordinator at any level . . . may reject and return to the inmate without response a Request or an Appeal that is written by an inmate in a manner that is obscene or abusive, or does not meet any other requirement of [Part 542]." *Id.* ¶ 11 (quoting 28 C.F.R. § 542.17(a)). The Coordinator rejects BP-9s that contain unrelated issues or are submitted without required documentation regarding informal resolution attempts. SEA 1330.13(g) ¶¶ (5)b), (6)(b). It is the responsibility of the Coordinator to sign rejection notices. PS 1330.13 ¶ 5. When an inmate fails to sign a submission, submit required copies, or makes some other correctable defect, the Coordinator gives a reasonable extension of time to correct the defect and resubmit the BP-9.

*Id.* ¶ 11. The Program Statement further provides:

> When deciding whether to reject a submission, Coordinators, especially at the institution level, should be flexible, keeping in mind that major purposes of this Program are to solve problems and be responsive to issues inmates raise. Thus, for example, consideration should be given to accepting a Request or Appeal that raises a sensitive or problematic issue, such as medical treatment, sentence computation, staff misconduct, even though that submission may be somewhat untimely.

*Id.* Inmates may appeal the rejection of a BP-9 if not given an opportunity to correct the submission

and resubmit. *Id.* (relying on § 542.17(c)).

Within twenty days of the filing of a BP-9, the Warden generally issues a formal response.[11]
*Id.* § 542.18. If dissatisfied with the Warden's response, an inmate may appeal the response to the
appropriate Regional Director through a BP-10, and if dissatisfied with the Regional Director's
response, the inmate may appeal to General Counsel through a BP-11. *Id.* § 542.15(a). Upon com-
pleting this multiple-tiered review process, federal inmates have exhausted the administrative
remedies required for filing a § 2241 petition.

## C. Implementation of Procedures

Both prisoners and prison personnel testified that to present an issue of concern informally
to staff within the meaning of 28 C.F.R. § 542.13(a), inmates at FCI Seagoville generally submit a
request or complaint on a form titled "Inmate Request to Staff" (also known as a "cop-out form").
When an inmate proceeds to the formal portion of the administrative remedies, he obtains[12] and
completes a BP-9.

As counselor at FCI Seagoville, McShan has responsibility for handling informal complaints
presented by inmates and documenting such complaints on a BP-8 form. Although the BP-8 form
itself indicates that such form "is part of the investigative product and will not be provided to the
inmate", McShan gives BP-8s to inmates and such form is routinely made available to inmates.
According to McShan, cop-out and BP-8 forms can be used for the same types of requests or

---

[11] The response times set forth in § 542.18 are subject to being shortened for emergency cases and lengthened if the
response time is not sufficient to make an appropriate decision. *See* 28 C.F.R. § 542.18. In addition, in those
circumstances when an inmate does not receive a response within the time allotted, including extension, the absence
of a response may be considered to be a denial at that level. *Id.*

[12] Although the regulations require inmates to obtain administrative forms from appropriate prison personnel, such forms
were available from other prisoners at FCI Seagoville and from the prison law library during the relevant time period.

complaints, but the BP-8 is the required form "to go through the proper process and not be rejected".[13]

McShan also has primary responsibility for issuing BP-9 forms to inmates. He is responsible for accepting BP-9s from inmates,[14] but such responsibility is limited to receiving or taking the form from the inmate, completing remaining paperwork, and forwarding the form to the appropriate person. He has no responsibility for making any decision regarding acceptance of BP-9s. He accepts BP-9s whether or not he issued the form, and whether or not the inmate has provided attachments regarding attempts to informally resolve the complaint. Based upon Institution Supplement SEA 1330.13(g), *Administrative Remedy Program* (May 31, 2006), submitted as Petr.'s Ex. 4 at the evidentiary hearing, McShan believes that he is authorized to "reject" a BP-9 that he did not issue. He does not accept BP-9s tendered to him when he is outside his office, and he sometimes returns procedurally defective BP-9s that he has received in his mailbox so as to give the inmate an opportunity to correct a perceived deficiency.

Blakely is responsible for decisions regarding accepting and rejecting BP-9s. She considers it problematic for a counselor not to accept a BP-9. Although Blakely recognizes that she has discretion to waive compliance with the informal step of the administrative process when an inmate provides a valid reason for bypassing that step, she has never done so.

Milton has no responsibility regarding accepting or rejecting BP-9s, although she occasionally

---

[13] At FCI Seagoville, there is confusion among inmates and some prison personnel regarding the difference between the "cop-out" and BP-8 forms. For example, Milton testified that she has taken "some BP-8s" from inmates, and identified Petr.'s Ex. 17 as the first one, although the exhibit is an "Inmate Request to Staff", *i.e.*, a cop-out form, directed to Milton from inmate Michael Tisdale.

[14] It is common knowledge among prisoners at FCI Seagoville that BP-9s must be given to McShan. The AOH specifically directs inmates to return completed BP-9s to the counselor.

provides the form to inmates. Although she heard inmates complaining about McShan not taking BP-9s, no inmate approached her for advice or directly complained to her about it.

## D. Utilization of Procedures

On April 18, 2007, petitioner attempted to submit his BP-9 to McShan, but McShan refused to accept it. Petitioner made no effort to present his BP-9 to other prison personnel or to report McShan's refusal, and he took no further steps to exhaust his administrative remedies.

## III. EXHAUSTION

It is well-established that petitioners seeking relief under § 2241 generally must exhaust their administrative remedies prior to presenting their claims in federal court. *See Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curiam) (addressing exhaustion in context of a § 2241 challenge by a federal prisoner to a parole decision); *Mihailovich v. Berkebile*, No. 3:06-CV-1603-N, 2007 WL 942091, at *5-7 (N.D. Tex. March 28, 2007) (recommendation accepted by District Court which addressed exhaustion in context of § 2241 action seeking release to a halfway house or home confinement). Exhaustion under § 2241 requires that the petitioner fairly present all of his claims through appropriate channels prior to pursuing federal habeas relief. *Dickerson v. Louisiana*, 816 F.2d 220, 228 (5th Cir. 1987) (addressing § 2241 filed by a state pre-trial detainee).

"Application of the [exhaustion] doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved." *McKart v. United States*, 395 U.S. 185, 193 (1969). "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence – to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 (1972); *accord Willard v. Van Buren*, No. 4:04-CV-287-A, 2004 WL 994069, at *1 (N.D. Tex.

Apr. 30, 2004) ("The purpose of the exhaustion requirement is to permit the federal agency being challenged to correct its own error without court intervention."). Inmates who begin the administrative grievance process but voluntarily halt the process prematurely have not properly exhausted their administrative remedies, and substantial compliance with administrative procedures does not suffice to exhaust administrative remedies. *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001) (civil action under 42 U.S.C. § 1983).

In this case, it is undisputed that petitioner failed to file a BP-9 and thus failed to complete the administrative review process. Petitioner argues, however, that McShan's refusal to accept his BP-9 rendered further administrative review unavailable, and that respondent should be equitably estopped from asserting his failure to exhaust because of the affirmative misconduct by McShan.

"Although prisoners generally must exhaust their administrative remedies prior to filing a § 2241 action, exhaustion of such remedies is not a jurisdictional requirement." *Mihailovich v. Berkebile*, No. 3:06-CV-1603-N, 2007 WL 942091, at *6 (N.D. Tex. March 28, 2007) (recommendation accepted by District Court). Non-jurisdictional exhaustion requirements "may be subject to certain defenses such as waiver, estoppel or equitable tolling." *Wright v. Hollingsworth*, 260 F.3d 357, 358 n.2 (5th Cir. 2001). Furthermore, when "the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action", petitioners need not exhaust administrative remedies. *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curiam) (citation omitted). Such exceptions to the exhaustion requirement "apply only in 'extraordinary circumstances,' and [petitioner] bears the burden of demonstrating the futility of administrative review." *Id.* (citations omitted). If a federal inmate carries his burden to demonstrate an applicable exception to the exhaustion require-

ment, such inmate may obtain a merits ruling on his § 2241 petition despite a lack of exhaustion. *See id.*

The primary procedural issue in this case is whether the actions of McShan rendered administrative remedies at FCI Seagoville unavailable to petitioner. Petitioner carries the burden on this issue. Although the Fifth Circuit has not defined the terms "available" and "exhaust" in the context of § 2241, it has utilized the following definitions in the context of 42 U.S.C. § 1997e(a), which has similar requirements for exhaustion:

> Webster's New International Dictionary defines "available" as "capable of availing; having sufficient power or force to achieve an end," "such as may be availed of: capable of use for the accomplishment of a purpose: immediately utilizable," and "that is accessible or may be obtained: personally obtainable." "Exhaust" is defined as "to take complete advantage of (legal remedies)."

*Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir. 1998) *abrogated in part by Jones v. Bock*, 127 S. Ct. 910 (2007) (abrogating the holding in *Underwood* that a district court may dismiss a civil complaint *sua sponte* for failure to exhaust). There appears to be no reason to utilize different definitions in this § 2241 action.

Although it is a very close case, petitioner has shown by a preponderance of the credible evidence presented to the Court that Counselor McShan departed from standard prison procedure at the first step of the formal component of the administrative process at FCI Seagoville by refusing to accept his BP-9. At the hearing, McShan conceded that he does not accept BP-9s unless he is in his office, but he also specifically testified that he has never refused to accept a BP-9 from an inmate. His testimony is internally inconsistent. His testimony is also inconsistent with credible testimony from Milton that McShan sometimes returns to inmates what he perceives to be procedurally defective BP-9s that have been placed in his mailbox. Milton also heard inmates complaining

that McShan was refusing their BP-9s. Weighing the testimony and evidence presented as a whole, the Court finds credible the testimony from the eight inmates who testified at the hearing and the proffered evidence from other inmates that McShan refused to accept proffered BP-9s from them.

"[M]isconduct of prison officials in connection with an inmate's attempt to exhaust may render administrative remedies unavailable and, thus, preclude a defendant from raising failure to exhaust as an affirmative defense." *Bailey v. Fed. Bureau of Prisons*, No. 3:06-CV-1318-N, 2007 WL 1599124, at *4 n.5 (N.D. Tex. May 18, 2007) (recommendation of magistrate judge), *accepted by* 2007 WL 1610134 (N.D. Tex. June 4, 2007). Refusals to provide necessary forms to exhaust administrative remedies constitute such misconduct and thus render the remedies unavailable to the prisoner. *See Aceves v. Swanson*, 75 Fed. App'x 295, 296 (5th Cir. 2003) (per curiam). A refusal to accept a proffered BP-9 likewise renders administrative remedies unavailable when the refusal comes from the person who is designated to receive them and has no authority not to accept them.

By proffering his BP-9 to McShan, petitioner took complete advantage of the first formal step of the administrative process in place at FCI Seagoville. By refusing to accept such BP-9, McShan effectively made the process insufficient to achieve its intended end and eliminated petitioner's personal access to the process so as to deny him his administrative avenue for relief. The refusal rendered administrative remedies unavailable to petitioner. Consequently, petitioner could proceed directly to this Court without completing the administrative process. This is not a case where the inmate voluntarily halted the administrative process; it is a case where a prison counselor departed from standard prison procedures and refused to accept a BP-9 proffered to him.

At the evidentiary hearing, respondent argued that even if McShan refused to accept petitioner's BP-9, petitioner had other available remedies that he chose not to pursue. He contends

that, at the prison level, petitioner could have gone directly to the Warden, McShan's supervisor, or the Coordinator. He argues that PS 1330.13 ¶ 8, which provides that the Coordinator may accept a BP-9 even though the inmate has bypassed informal resolution, provides an alternate avenue that petitioner did not pursue. Through the testimony of Blakely, he suggests that PS 1330.13 ¶ 11, which provides criteria for rejecting a submission, favors the acceptance of a BP-9 that raises a problematic issue such as a counselor not accepting a BP-9. However, no written procedure provides for the submission of a BP-9 directly to the identified prison personnel. The written procedures instead identify the counselor as the proper person to submit BP-9s. In addition, the AOH informs inmates to submit BP-9s to their counselor, Milton would refer inmates to McShan for submission of BP-9s, and the inmates viewed McShan as the proper recipient of their BP-9s. Although respondent presented testimony regarding other avenues for relief, such testimony does not alter the written procedures known and available to inmates.

Neither PS 1330.13 ¶ 8 nor ¶ 11 provide a basis for finding that an inmate may go directly to the Coordinator. Paragraph 11 provides guidance to Coordinators regarding when to reject a submission, not when they should accept a BP-9 directly from an inmate without the BP-9 being submitted to the Counselor – the designated recipient for BP-9s. Paragraph 8 recognizes that the Coordinator has the discretion to accept a BP-9 even when the inmate has bypassed informal resolution, but bypassing the informal step does not equate to bypassing the requirement that inmates submit their BP-9s to the counselor. Furthermore, Blakely has never waived informal resolution, and specifically testified that she "would reject" a BP-9 submitted directly to her.

Respondent also suggests that sensitive complaints may be submitted directly to the Regional Director. However, a complaint regarding placement in a halfway house or on home confinement

is not an issue properly raised in a sensitive complaint. Nothing of record shows the issue to be sensitive in nature or that petitioner's safety or well-being would be placed in danger if his request became known at FCI Seagoville. Furthermore, even if the issue was properly raised in a sensitive complaint, § 542(d)(1) merely gives the inmate an option to bypass the institution in favor of the Regional Director – it does not require that sensitive complaints be submitted directly to the Regional Director.[15] By presenting his BP-9 to McShan, petitioner clearly exhibits his belief that his complaint does not qualify as a sensitive complaint. That his prison counselor refused to accept his BP-9 does not alter that belief or transform the complaint into one that may be submitted directly to the Regional Director.

For all of these reasons, the Court finds that McShan's refusal to accept petitioner's BP-9 rendered further administrative remedies unavailable to petitioner.[16]

## IV. CLAIMS

Petitioner claims that the BOP has categorically denied him placement in home confinement or a halfway house or CCC, and he specifically challenges 28 C.F.R. §§ 570.20 and 570.21 and PS 7320.01 and 7310.04 concerning such placement. He argues that respondent is collaterally estopped from re-litigating the validity of the regulations because that issue was decided against respondent

---

[15] Section 542(d)(1) provides:
> If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

[16] Based on this finding, it is unnecessary to further consider petitioner's equitable estoppel argument.

in a prior habeas action in this Court, and further claims that respondent has violated his right to equal protection.

Respondent argues that he is not collaterally estopped from responding to petitioner's allegations, that petitioner has no constitutional or statutory right to placement in a halfway house or home confinement, and that the challenged regulations and program statements are appropriate interpretations of 18 U.S.C. §§ 3621(b) and 3624(c). He also argues that he has not violated petitioner's equal protection rights under the Constitution.

## A. **Collateral Estoppel**

"Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984). Parties commencing an action use collateral estoppel offensively when they seek to foreclose the opposing party from relitigating an issue previously decided against that party in a prior action. *Id.* at 158 n.4. In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979), the Supreme Court conditionally approved the offensive use of collateral estoppel by a non-party to the prior action. 439 U.S. at 331. In *Mendoza*, however, the Supreme Court specifically held that nonmutual, offensive collateral estoppel does not apply against a non-private party such as the United States. *See* 464 U.S. at 158, 162-63. The Fifth Circuit has extended the *Mendoza* principle to foreclose offensive use of such estoppel against the head of a governmental agency. *See Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 323 (5th Cir. 1984) (Secretary of the Department of Health and Human Services). Thus, petitioner may not offensively use collateral estoppel against the Warden of FCI Seagoville in this habeas action.

**B. <u>Statutory and Administrative Framework</u>**

Congress has enacted two statutory provisions which govern the place of incarceration for federal inmates. Section 3621(b) of Title 18 of the United States Code governs the initial designation of the place of imprisonment as well as any subsequent transfers to a different penal or correctional facility. It mandates that the BOP designate the place of imprisonment and provides it the discretion to "designate any available penal or correctional facility . . . considering" five enumerated factors: (1) the resources of the contemplated facility; (2) offense-specific information; (3) prisoner-specific information; (4) statements of the sentencing court; and (5) pertinent policy statements. *See* 18 U.S.C. § 3621(b). It further provides that the BOP transfer prisoners from one penal or correctional facility to another after considering the same factors. *Id.* Pre-release custody is governed by § 3624(c), which states in pertinent part:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.

In 1995, the BOP established a procedure for referring and placing pre-release inmates into home confinement programs. *See* BOP Program Statement 7320.01, *Home Confinement* (Sept. 6, 1995) (found on-line at http://bop.gov/DataSource/execute/dsPolicyLoc). According to PS 7320.01:

> The Bureau does **<u>not</u>** have statutory authority to designate a home confinement program for an inmate at the beginning of his or her sentence. This is supported in Title 18, U.S.C., Section 3621, which requires that the Bureau designate any available **<u>penal or correctional</u>** facility as the place of a prisoner's imprisonment.

*Id.* ¶ 1. Although "[a]ll inmates referred to community corrections are eligible to be considered for home confinement placement", inmates are approved for such placement only by the Community

Corrections Manager (CCM) after consideration of various factors. *Id.* ¶ 6. In addition, although the BOP provides CCC services for individuals as a condition of probation, parole, or supervised release, it will assume responsibility for such persons on home confinement only in the most extraordinary of circumstances. *Id.* The Program Statement also provides for placement on home confinement following CCC placement and directly from an institution in appropriate circumstances. *Id.* ¶¶ 11-12.

Once an inmate is referred for CCC placement, the CCM reviews the referral material and refers the inmate to the most appropriate program, including home confinement programs. *Id.* ¶ 7.

> Occasionally, a referral may indicate no obvious risk to the community and no need for CCC services (for example, a supportive family, a stable residence, confirmed employment (if employable), and a positive institutional adjustment). In such cases, the CCM may bypass a CCC and place the inmate directly on home confinement.
> Conversely, higher risk inmates requiring extensive transition assistance may not be placed on home confinement at all, or placed only briefly following CCC placement.

*Id.* ¶ 7(b).

In December 1998, the BOP established guidelines regarding effectively using CCCs. *See* BOP Program Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure* (Dec. 16, 1998). The Program Statement provided that "the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the 'last ten per centum of the term,' or more than six months, if appropriate," but § 3624(c) "does restrict the Bureau in placing inmates on home confinement to the last six months or 10% of the sentence, whichever is less." *Id.* ¶ 5. It further stated that CCCs (now RRCs) have two components: (1) a Community Corrections Component and (2) a Prerelease Component, and it set forth guidelines for developing a release plan for each inmate, including decisions regarding CCC referral, which

"is normally established at a team meeting no later than 11 to 13 months before an inmate's projected release date." *Id.* ¶¶ 7-8.

In December 2002, the BOP changed its practice and began restricting CCC or RRC placements to the final ten percent of an inmate's term of imprisonment, not to exceed six months. *See generally Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 240 (3d Cir. 2005). Because "[t]he December 2002 Policy spawned numerous legal challenges from inmates who previously would have been eligible for CCC placement at any time during their incarceration, including the last six months", the BOP proposed new regulations in August 2004 to govern CCC placement decisions and, after receiving public comment, the BOP published the new regulations on January 10, 2005. *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 367-69 (E.D.N.Y. 2005) (collecting cases); *accord Woodall*, 432 F.3d at 240 (noting that the proposed regulations are found at 69 Fed. Reg. 51,213 (Aug. 18, 2004)).

The new regulations became effective on February 14, 2005, and are codified at 28 C.F.R. §§ 570.20 and 570.21. Section 570.20 addresses the purpose of the regulations:

> (a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement. The Bureau designates inmates to community confinement only as part of the pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.

> (b) As discussed in this subpart, the term "community confinement" includes Community Corrections Centers (CCC) (also known as "halfway houses") and home confinement.

Section 570.21 addresses the timing of CCC designations:

> (a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.

(b) We may exceed these time frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A), or shock incarceration program (18 U.S.C. 4046(c)).

## C. Validity of 2005 Regulations

In this action, petitioner specifically challenges the validity of the 2005 regulations. Neither the Fifth Circuit nor the United States Supreme Court have addressed the validity of the 2005 regulations challenged in this action. However, the validity of these regulations, as they apply to RRC placement or home confinement placement, was directly considered by this Court in *Mihailovich v. Berkebile*, No. 3:06-CV-1603-N, 2007 WL 942091 (N.D. Tex. March 28, 2007).

### 1. RRC Placement

In *Mihailovich*, this Court followed the majority opinions in *Wedelstedt v. Wiley*, 477 F.3d 1160 (10th Cir. 2007); *Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006); *Fults v. Sanders*, 442 F.3d 1088 (8th Cir. 2006); and *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235 (3d Cir. 2005), to invalidate the 2005 regulations as they relate to RRC placement because they preclude consideration of all factors enumerated in 18 U.S.C. § 3621(b) and "do not permit the BOP to consider CCC placement prior to the last ten percent of [the inmate's] sentence". *See* 2007 WL 942091, at *9-10. The Court recognized *Woodall* as the general approach taken by the courts of appeal; *Woodall* specifically rejected the same arguments asserted by the respondent in *Mihailovich*, including arguments based upon *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)[17] and *Lopez*

---

[17] In *Chevron*, the Supreme Court set out a two-step process when reviewing an agency's interpretation of a statute that it administers. *See* 467 U.S. at 842-43. More specifically,

> [w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well

*v. Davis*, 531 U.S. 230 (2001).[18]  *See id.* at \*9.  More recently, *Briggs v. Van Buren*, No. 4:06-CV-0800-Y, 2007 WL 3019238 (N.D. Tex. Oct. 16, 2007), likewise rejected respondent's reliance on *Chevron* and *Lopez*, and followed the four circuit decisions and *Mihailovich* to invalidate the 2005 regulations as they relate to RRC placement.  *Id.* at \*2-5.

Respondent argues that the regulations challenged in this action are appropriate interpretations of 18 U.S.C. §§ 3621(b) and 3624(c), and are thus entitled to deference under *Chevron* and *Lopez*.  (*See* Answer at 17-22.)  As found in *Mihailovich* and *Briggs,* deference under *Chevron* is simply not warranted, however.  First, because the regulations elevate time served to a determinative factor rather than considering time served in conjunction with the five listed factors, the regulations appear contrary to the clear congressional intent that the BOP consider the five factors listed in § 3621(b).  As aptly stated by the Third Circuit, "we are faced with a statute providing that the BOP must consider several factors in CCC placement, and a regulation providing that the agency may not consider those factors in full.  The conflict between the regulations and the statute seems unavoidable."  *Woodall*, 432 F.3d at 249.  Additionally, because the statute does not permit a non-listed factor to effectively trump consideration of the five listed ones as the 2005 regulations seem to

---

as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43 (footnotes omitted).

[18] In *Lopez*, the Supreme Court upheld a BOP regulation (28 C.F.R. § 550.58) that limited discretion granted to the BOP under 18 U.S.C. § 3621(e)(2)(B) to reduce a prisoner's sentence for successfully completing a treatment program if the prisoner's current offense is a felony involving a firearm.  531 U.S. at 238-44.  In doing so, the Supreme Court stated: "'[E]ven if a statutory scheme requires individualized determinations,' which this scheme does not, 'the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.'"  *Id.* at 243-44 (quoting *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991) and citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)).

dictate, the regulations appear manifestly contrary to § 3621(b) and thus constitute an impermissible construction of the statute. Consequently, the regulations are entitled to no *Chevron* deference even if the Court finds § 3621 ambiguous. Furthermore, *Lopez* does not dictate a different outcome because "individual determinations are required by § 3621(b)" and the "sentencing recommendations and other individual factors . . . are not generally applicable" so as to provide a basis for the regulations. *Woodall*, 432 F.3d at 247; *accord Briggs*, 2007 WL 3019238, at *5 (concluding that "because § 3621(b) sets out specific individualized factors, it is different from the issue resolved by the Supreme Court in reviewing the terms of § 3621(e)(2)(B), such that *Lopez* does not control this Court's review of 28 C.F.R. §§ 570.20 and 21"); *Mihailovich*, 2007 WL 942091, at *9 (finding *Woodall* persuasive and rejecting respondent's argument based upon *Lopez*).

Respondent also argues that although the circuit courts "have rejected the reasoning supporting the questioned regulations and policies," the interpretation of those courts regarding 18 U.S.C. § 3621(b) renders § 3624(c) meaningless. (Answer at 17.) In addition, he argues that § 3621(b) authorizes the BOP to consider the listed factors only when it has first elected to consider whether to transfer an inmate. (*See id.* at 17-18.) The *Woodall* decision also addresses these arguments. With respect to the first argument, "§ 3624 does not determine when the BOP should *consider* CCC placement, but when it must *provide* it." *See* 432 F.3d at 250. Interpreting § 3621(b) to require consideration of the five factors listed therein does not render § 3624(c) meaningless in any respect. *Woodall* rejected the latter argument because (1) the argument ignores the fact that the BOP considered the question of halfway house placement when it promulgated the 2005 regulations and (2) the statute clearly exhibits an intent that the five factors "be considered in making

determinations regarding where to initially place an inmate, as well as whether *or not* to transfer him." *Id.* at 249-50.

Respondent further argues that the 2005 regulations do not conflict with congressional intent as shown by a Senate Judiciary Committee Report, which states that "[t]he Committee, by listing the facts for the Bureau to consider in determining the appropriateness or suitability of any available, facility, does not intend to restrict or limit the Bureau in the exercise of its existing discretion." (Answer at 21 (citing S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3325).) He contends that this legislative history shows that the BOP's treatment of the § 3621(b) factors as discretionary is consistent with congressional intent in enacting the statute. (*Id.*) *Woodall* again provides a strong answer to this argument. First, the language quoted by respondent does not recognize the specific language quoted in *Woodall* from the same Senate report which reflects that the BOP is "specifically required" to consider the § 3621(b) factors and "*[a]fter considering these factors*, the Bureau of Prisons *may* designate the place of imprisonment in an appropriate type of facility, or may transfer the offender to another appropriate facility". *Woodall*, 432 F.3d at 245-46 (quoting with added emphasis S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3324-25). Second, *Woodall* addressed a similar argument that the § 3621(b) factors are discretionary because the BOP may "consider *additional* factors in making CCC determinations." *Id.* at 247. In rejecting such argument, it stated:

> We find this argument unpersuasive. The question whether the BOP may consider additional factors is separate and unrelated to the question whether it can ignore altogether the very factors delineated by Congress in the governing statute itself. Neither the BOP nor the government has cited a single indication that Congress felt

the BOP could categorically refuse to consider in full one of the factors explicitly enumerated in § 3621.

*Id.*

For all of these reasons, the Court rejects respondent's various arguments for departing from the approach adopted in *Mihailovich* with respect to RRC placement. Under *Mihailovich* and *Briggs*, the 2005 regulations are invalid because they do not permit the BOP to consider the § 3621(b) factors or RRC placement prior to the last ten percent of an inmate's sentence.

### 2. *Home Confinement*

With regard to application of the 2005 regulations to home confinement placement, *Mihailovich* initially found that placement in a "penal or correctional facility", as that phrase is used in 18 U.S.C. § 3621(b), does not include home confinement placement. *See* 2007 WL 942091 at *7 (citing *Crowley v. Fed. Bureau of Prisons*, 312 F. Supp. 2d 453, 461 (S.D.N.Y. 2004) (noting that PS 7310.01 excludes "home confinement" from the definition of "penal or correctional facility"); *United States v. Morales-Morales*, 985 F. Supp. 229, 231 (D.P.R. 1997) (same)).[19] Further, § 3621(b) provides no statutory authority for the BOP to designate a prisoner's home as a place of imprisonment. *Id.* at *10. In addition, "[u]ntil petitioner is within the last ten percent of his sentence, not to exceed six months, § 3624(c) provides no basis for placement in home confinement." *Id.* When a petitioner has not reached the last ten percent of his sentence, "the BOP properly denie[s] him release to home confinement without consideration of the factors in § 3621(b) regardless of the February 2005 regulations." *Id.*

---

[19] *Crowley* and *Morales-Morales* reference PS 7310.01. However, it is PS 7320.01 which relates to home confinement and distinguishes home confinement from a penal or correctional facility.

In his reply brief, petitioner argues that 18 U.S.C. § 3621(b) allows placement of an inmate in home confinement at any point in his sentence.  (Reply at 11.)  He contends that when the statute directs that the BOP "shall" designate the place of imprisonment and "may" designate any available penal or correctional facility which meets minimum standards, the statute contemplates the designation of a place of imprisonment that is not a penal or correctional facility.  (*Id.* at 12-13.)  However, the use of "may" in the statute merely expresses the BOP's discretion to choose between available penal or correctional facilities which satisfy the minimum standards, not that the BOP has discretion to designate a place of imprisonment outside such a facility.  Because home confinement does not equate to a penal or correctional facility, § 3621(b) does not permit the BOP to designate an inmate's home as his place of imprisonment.  The statute likewise does not permit the BOP to transfer an inmate to home confinement; it only permits a transfer from one penal or correctional facility to another such facility.  Petitioner's argument provides no reason to depart from the approach taken in *Mihailovich* with respect to home confinement.

As found in *Mihailovich*, the 2005 regulations do not alter the statutory scheme as it relates to placement in home confinement.  In that context, the regulations are entirely consistent with §§ 3621(b) and 3624(c).

### D.  Validity of Program Statements

Petitioner specifically asks the Court to invalidate Program Statements 7320.01 and 7310.04, and a "defacto [sic] policy" that has emerged from them.  (Pet. at 8-11; Reply at 16-24.)  He argues that although the BOP may bypass placement in a CCC and place him in home confinement consistent with Program Statement 7320.01, the BOP has established a de facto policy to require place-

ment in a CCC before placement on home confinement. (Pet. at 8-9.) He contends that the program statements are invalid for the same reasons as the regulations. (*Id.* at 9-10.)

### 1. *Program Statement 7320.01*

Program Statement 7320.01 relates solely to home confinement. As discussed in the prior section, the 2005 regulations are entirely consistent with 18 U.S.C. §§ 3621(b) and 3624(c) in the home confinement context. Program Statement 7320.01 is likewise entirely consistent with those statutes in that context. Its stated purpose is to establish procedures related to home confinement placement for pre-release inmates. *See* BOP Program Statement 7320.01, *Home Confinement* (Sept. 6, 1995) ¶ 1. It establishes such procedures consistently with the statutes and appropriately recognizes that home confinement does not equate to a "penal or correctional facility" as that phrase is used in § 3621(b). *See id.* That the 2005 regulations are invalid as they relate to RRC placement provides no basis to invalidate a program statement which relates solely to home confinement.

Petitioner argues that Program Statement 7320.01 encourages direct placement on home confinement for inmates who have (1) a stable residence, (2) supportive family, (3) good institutional adjustment, and (4) confirmed employment. (Reply at 18.) Petitioner, however, misconstrues the program statement. Paragraph 7(b) of the program statement merely identifies those four characteristics as indicative of inmates who may have no need for CCC services. Before the CCM may consider direct placement on home confinement, the inmate must also pose no obvious risk to the community. *See* PS 7320.01 ¶ 7(b). Furthermore, although ¶ 6 contains language regarding encouraging direct placement on home confinement, it does not represent the global encouragement as presented by petitioner. It merely encourages direct placement of certain individuals "on home confinement with special reporting requirements." Because the individuals must present special

circumstances concerning home confinement as listed in ¶ 6(a) through (e) *and* be otherwise eligible for direct placement, *see id.* ¶ 6, the encouragement is focused on imposing the special reporting requirements, not on direct placement on home confinement.

Petitioner also complains that respondent misconstrues Program Statement 7320.01 by arguing that home confinement is an option only in the most extraordinary circumstances. (Reply at 17-18.) Petitioner correctly points out that respondent relies on a portion of Paragraph Six of the Program Statement that addresses home confinement for persons as a condition of probation, parole, supervised release. That portion of Paragraph 6 imposes no general requirement that extraordinary circumstances be present before the BOP considers an inmate for placement on home confinement. Furthermore, Program Statement 7320.01 contains no other provision that requires a showing of extraordinary circumstances. However, this provides no basis for habeas relief. Until inmates are referred for placement in a CCC or halfway house, the BOP has no occasion to consider them for home confinement.

For the foregoing reasons, petitioner has provided no adequate reason to invalidate Program Statement 7320.01.

### 2. *Program Statement 7310.04*

As to Program Statement 7310.04, which concerns RRC placement, neither the Fifth Circuit nor the Supreme Court has addressed its validity. However, this District Court recently found in *Grote v. Berkebile*, No. 3:07-CV-0863-B, that the invalidity of the 2005 regulations does not invalidate Program Statement 7310.04.

In doing so, the Court relied on *Leon-Rivera v. Smith*, No. 1:07-CV-00823-OWW, 2007 WL 2900222 (E.D. Cal. Oct. 4, 2007) (recommendation of magistrate judge), *adopted by* 2007 WL

3293356 (E.D. Cal. Nov. 6, 2007) and *Ghag v. Smith*, No. 1:07-CV-00561-AWI, 2007 WL 2385070

(E.D. Cal. Aug. 17, 2007) (recommendation of magistrate judge), *adopted by* 2007 WL 2902949

(E.D. Cal. Oct. 3, 2007). In *Ghag*, the court found that Program Statement 7310.04 is not "deriva-

tive of the discredited regulations." 2007 WL 2385070, at *3. The Program Statement, further-

more, does not "improperly limit the discretion of the BOP to make an RRC placement in any

individual case or otherwise 'circumvent' the BOP's other regulations." *Leon-Rivera*, 2007 WL

2900222, at *3. In fact, Paragraph 8 of the Program Statement specifically requires prison personnel

to commence "release planning at an inmate's first team meeting" and provides three guidelines with

respect to an inmate's release plan:

> a. Planning early in an inmate's period of confinement is necessary to ensure release preparation needs are identified and appropriate release preparation programs are recommended.

> b. Preliminary decisions regarding eligibility for CC Programs are to be made well in advance of the last year of confinement.

> c. A final and specific release preparation plan, including a decision as to CCC referral, is normally established at a team meeting no later than 11 to 13 months before an inmate's projected release date.

As succinctly and accurately stated in both *Leon-Rivera* and *Ghag*:

> Nothing in the Program Statement *prevents* the BOP, in the exercise of its statutory discretion, from making an earlier determination, although the Court is not aware of any statute or regulation that requires such expedited action by the BOP. In other words, the Program Statement simply insures that inmates will receive an RRC assessment sufficiently in advance of their release date to permit them to make appropriate plans prior to their transfer. Because the Program Statement does not limit or otherwise intrude on the BOP's exercise of discretion in making its RRC assessment, the Program Statement . . . is not in any way analogous to the 2002 and 2005 regulations that many courts . . . have found to be an illegal limitation on the discretion vested in the BOP by § 3621(b).

*Id.*; *Ghag*, 2007 WL 2385070, at *3.

*Leon-Rivera* and *Ghag* appropriately consider the interplay between Program Statement 7310.04 and the discredited regulations. As previously stated in *Grote*, the reasoning of these cases is persuasive; based thereon, the Court finds that the invalidity of the 2005 regulations does not invalidate Program Statement 7310.04. Petitioner provides no adequate reason to invalidate the program statement.

### 3. *De facto Policy*

Petitioner alleges that although the program statements provide for direct placement on home confinement, the BOP has a de facto policy to place inmates at an RRC simply to enrich the RRC. (Reply at 19-24.) Petitioner fails to recognize that all inmates placed on home confinement, whether directly from the institution or after a stay at an RRC, are subject to a required fee once they obtain employment or have other means of financial support. *See* PS 7320.01, Attachment B; PS 7310.04 ¶ 7(b)(3). The fees are used to defray program costs, *see* PS 7320.01, Attachment B, and/or costs associated with home confinement and electronic monitoring, *see* PS 7310.04 ¶ 7(b)(3). Because the imposed fee applies equally to inmates whether placed directly on home confinement or after an RRC stay, the alleged financial incentive provides no reason to invalidate the alleged de facto policy. Such policy, moreover, provides no basis for habeas relief.[20]

For all of these reasons, the Court finds no basis to invalidate Program Statement 7320.01 or 7310.04 or the alleged de facto policy that emerged from them.

---

[20] In his summary of claims, petitioner asserts that respondent is failing to exclusively consider his placement into home confinement, but instead relies on a third-party to consider and designate him for home confinement. (*See* Pet. at 13.) Other than the brief statement of this claim in his summary, petitioner provides nothing to support it. To the extent it differs from his challenge to the de facto policy, the Court finds that it also does not entitle him to habeas relief.

### E. Equal Protection

Petitioner also argues that respondent has violated his right to equal protection by treating him differently than Mihailovich and from individuals already housed in a halfway house.  (Pet. at 11-13 & n.1; Reply at 24.)

"The Due Process Clause of the Fifth Amendment applies to the federal government a version of equal protection largely similar to that which governs the states under the Fourteenth Amendment." *Rodriguez-Silva v. INS*, 242 F.3d 243, 247 (5th Cir. 2001).  While the two protections may not be identical, their principles require the same analysis under both Amendments.  *Id.*  Under the Fourteenth Amendment, "a party who wishes to make out an Equal Protection claim must prove 'the existence of purposeful discrimination' motivating the [governmental] action which caused the complained-of injury."  *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997).  To establish an equal protection claim, petitioner must show that he was treated differently from similarly situated persons without a rational basis.  *United States v. Abou-Kassem*, 78 F.3d 161, 165 (5th Cir. 1996); *Sonnier v. Francis*, 217 Fed. App'x 410, 411 (5th Cir. 1997) (addressing issue in context of whether application of § 570.21 violated his right to equal protection).  The crux of an equal protection claim is that the complaining person was treated differently from similarly situated individuals.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Petitioner has not alleged, much less shown, that he has been denied placement in a halfway house or on home confinement due to purposeful discrimination or any impermissible motive.  For that reason alone, petitioner has stated no viable equal protection violation.  Individuals already housed in a halfway house are not similarly situated to him.  In addition, although Mihailovich was housed at the same facility as petitioner, petitioner has not shown him to be a similarly situated

individual. As should be apparent from the analysis given to the claims raised in this action, the placement of an inmate into a halfway house or RRC requires an individual determination of the factors set forth in 18 U.S.C. § 3621(b). The individual considerations will generally provide a rational basis for different outcomes. Petitioner is entitled to no habeas relief on his equal protection claim.

## V. REMEDY

Petitioner wants the Court to compel respondent to consider him for direct placement on home confinement, or alternatively, for placement in an RRC. (Pet. at 20.) He further seeks an order to invalidate 28 C.F.R. §§ 570.20 and 570.21; Program Statements 7310.04 and 7320.01; the de facto policy discussed herein, and to enjoin respondent from further using such invalidated policies and practices. (*Id.*)

For reasons already discussed, the Court should invalidate 28 C.F.R. §§ 570.20 and 570.21, but deny the request to invalidate the Program Statements and alleged de facto policy. Additionally, because petitioner has not yet been referred for halfway house placement and is thus not entitled to be considered for direct placement on home confinement, the Court should deny the request for such consideration. In light of the invalidity of the 2005 regulations, petitioner is entitled to consideration for placement in an RRC consistent with 18 U.S.C. § 3621(b), and a limited injunction regarding respondent's further use of the invalidated regulations against him. When a district court invalidates a federal regulation, it may enjoin further enforcement of the regulation as to the petitioner before it. *See Jones v. Zenk*, 495 F. Supp. 2d 1289, 1310-11 (N.D. Ga. 2007) (enjoining enforcement of 28 C.F.R. § 570.21 against the petitioner before the court). A broader

injunction is inappropriate because district courts are not bound by the decisions of other district courts.  *Id.* (citing *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991)).

In this case, the appropriate remedy for respondent's failure to give petitioner an individualized review as required by § 3621(b) is to order the BOP through respondent to consider in good faith whether petitioner should be transferred to an RRC considering the five factors set out in § 3621(b) without regard for the invalidated regulations.  *See Mihailovich v. Berkebile*, No. 3:06-CV-1603-N, 2007 WL 942091, at *10 (N.D. Tex. March 28, 2007).  While the BOP has discretion to transfer a prisoner to a halfway house under § 3621(b) at any time, the statute does not mandate that it do so.  *Id.*

## VI.  RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the District Court **GRANT** petitioner's federal petition for writ of habeas corpus to the extent he seeks to invalidate 28 C.F.R. §§ 570.20 and 570.21 so as to obtain an individualized review of the five factors set out in 18 U.S.C. § 3621(b).  The Court should order respondent through the BOP to consider in good faith whether petitioner should be transferred to an RRC considering the five factors set out in § 3621(b) as they relate individually to petitioner without regard to the invalidated regulations, and that such consideration occur within a specific time frame after the acceptance of this recommendation.  The Court should otherwise **DENY** the instant federal petition for writ of habeas corpus.

**SIGNED this 13th day of December, 2007.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on all parties by mailing a copy to each of them. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. Failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE